All right, our second case for this morning is Makiel v. Butler, and we'll hear from Ms. Kapp. May it please the Court, the case before this Court was a very closely balanced case, as the only justice to consider this issue concluded. There was no physical or scientific evidence linking Mr. Makiel to the crime. In fact, one of his co-defendants was acquitted by a jury, and the other traded his testimony against Mr. Makiel for his freedom from prosecution. You know, I'm going to start – I'd like to start you out on this issue, because you've argued that the suppression of Makiel's statements that he made on the car ride from Indiana to Illinois was clearly a weaker issue than the impeachment issue. But I wonder how we know this to be true. In other words, do we know what statements he made to the state's attorney during that extradition? Do we know? Yes, Your Honor. He – at some point during the evening of – arguably, one interpretation would be at some point, we don't know when, during the evening of Ms. Haack's murder, he agreed that he may have stopped by the mobile station. And so he argued for suppression because he had requested counsel for his extradition from Indiana to Illinois. But it was an open question under Illinois law at that time whether or not the invocation of counsel for extradition proceedings extended to the underlying charge. And because it was an open question of law, there was obviously a gamble in pursuing this particular path for relief. In contrast, with respect to the impeachment grounds, the law was quite clear and clear in Mr. Makiel's favor that he had an absolute right to introduce this impeachment evidence because it went to Alan Martin's bias. And the trial court had no discretion to deny that. This was very powerful impeachment evidence. The – I think a little bit of context to understand why is important. As I mentioned, there was no physical or scientific evidence linking Mr. Makiel to this crime. So the state's case hinged entirely on the – on credibility assessments, in particular, the credibility of its star witness, Todd Linko. But Todd Linko had serious credibility issues. He had made several prior statements inconsistent with his trial testimony, including one entirely exculpating Mr. Makiel. And he also got an incredible deal in exchange for his testimony. The prosecution entirely dropped the charges of armed robbery and murder against him in exchange for his testimony. And not only that, they essentially gave him no sentence on a pending narcotics charge. So – but all of that is true, but taking the – taking the impeachment evidence, particularly Mr. Anderson, are – it's – your brief gives me the impression that you think we should look at Anderson as of the moment of the original trial and see how he might have impeached then. But, of course, lots of other evidence comes in about Anderson at the time. And he's a catastrophe of a witness by the time you see everything. I'm sorry, Your Honor, I'm confused. Anderson was the – he was the individual who would have implicated someone else. There was no impeachment. Okay, so you're just talking about Spodak here? But was – forgive me, but let me follow up on that. Was there really any corroboration at all of Anderson's statement other than he happened to know two boys named Brian and Brandon at some point in his life? I mean, I have a problem. Yes, Your Honor. There was corroboration, and the corroboration for Anderson's statement in part was the fact that to the extent we're curious about who these individuals were who he said he was with, at the evidentiary hearing, he explained that these three boys, Brian, Brandon, and Jay, were his neighbors and his former friends. And he never recanted that he knew these individuals, that they were friends of his, that they were his neighbors. And, in fact, his mother testified after him. And his mother is one of the individuals to whom he made this inculpatory statement. She said the only aspect of it that she questioned was how he could have snuck out his window. She never questioned that these three boys who were his neighbors, in fact, were real. And I use the word boy, but they were teenagers. These were teenagers. But he recants. And he didn't know them until a year later, after the murder. According to one of them, yes. But the police didn't interview Jay. They never found him, as far as they knew. He didn't even exist. Well, according to the police, the police didn't find him, but the police also already had Mr. Mackle and Linko and Sam Illich in custody. And Anderson and his mother never waver on the fact that these three men are real men and that there was any question that it would be unsurprising for Anderson to be hanging out with them. They were his neighbors. But Anderson does waver on lots of other things. He recants, right? He gives this whole story that's helpful to Mr. Mackle, and then he recants. Yes, Your Honor. But, Justice in Chambers, the fact that there is a recantation, that goes to the issue of credibility. And in a case like this, where all of the witnesses had credibility issues, it's not enough that Anderson, too, had credibility issues to say that his testimony would not have been material under the compulsory process clause. But here's my EDPA question about that, though. As I said, by now, there's been a lot of proceedings, you know, four rounds in the state courts, the district court proceeding. And when we're asked to decide whether the ultimate decision of the state courts is in violation of the federal constitution, shouldn't we evaluate, say, the prejudice from whatever errors were made in light of the full record, not just in light of the record as it existed at the beginning? Yes, Your Honor. I'm not sure. The reason I say that is because if we just looked at the trial and we said, you know, should Anderson's testimony have come in? Should Spodak's testimony have come in? Should some of these other things have come in, you know, the existence of the forgery charge? It seems like, yeah, I mean, there were mistakes made. I don't have any problem agreeing with you that far. But did the mistakes in the final analysis make a difference? Or were the state courts, to be more accurate, still unreasonable in finding that they didn't make a difference? That's a much tougher question. Yes, Your Honor, those are two different questions. As to, let me address first the prejudice with respect to the impeachment evidence, because that's where a deference does apply. And therefore, this court would be looking to whether or not their decision was reasonable. But it was plainly unreasonable for five reasons. First, the state court in its prejudice analysis answered the wrong question. The question before the court in prejudice analysis is whether the evidence was closely enough balanced that this is an ineffective assistance on appeal question. So the question before the court was whether the evidence was closely enough balanced that the appellate court on direct review would likely have concluded that these exclusions could have affected the verdict. In other words, that's the first appellate court applying the Chapman Standard, which is what would have applied in Illinois to those exclusions. But that's not the question that was answered by the court in MACL-4. The only court to answer that question was Justice McCormick in his concurrence. And he concluded that the evidence was quite closely balanced. And that's with good reason. This case was entirely a credibility case. And Todd Linko had serious credibility issues. And so did his two key corroborating witnesses. Shane Miller and Alan Martin were both very important to the state's case. Because Shane Miller was the only witness to corroborate that Mr. Mackel had disposed of the gun over the Cal Sag River, which is important because the state didn't have a gun to introduce into evidence. They had no gun. They found no gun in Mr. Mackel's possession, on him, or in his residence that could be linked to this murder. Ms. Kemp, I guess I have trouble separating neatly between counsel's performance and evaluations of prejudice in this case. Since if I understand your claim correctly, it's ineffective assistance in the direct appeal, in the selection of issues to be pursued. Which means that, first of all, we try to evaluate whether appellate counsel reasonably evaluated the prospects of success, which sounds a lot like prejudice, right, in evaluating the different issues that might be raised, right? Yes, Your Honor. So, and I guess the concern that I have, I'll just tell you, I think the Illinois courts botched the handling of Anderson's testimony along the way, but ultimately, I think when we look at the record, there's just nothing there. But the Martin testimony concerns me. The impeachment that didn't happen for Martin with the forgery charge, allowing him to lie on the stand, is very troubling to me. On the other hand, I've got to say it looks like appellate counsel actually did pretty well, right? They got a remand on the Anderson issue. They got a dissent on the prosecutorial misconduct issue that was pursued. And trying to gauge an appellate court's evaluation of what errors might be harmless is a pretty dicey business, without the benefit of hindsight. It might be, Your Honor, in a case that wasn't so closely balanced, but there was no physical or scientific evidence linking Mr. Mackel to the crime, and it was clear from the record that Todd Lingo had serious credibility issues and Mr. Mackel was not allowed to effectively impeach these two key corroborating witnesses in a trial that turned entirely on credibility determinations. So under the Chapman harmless error standard, which is what appellate counsel would have been using to assess whether or not harmless error would be satisfied. Okay, but we have to evaluate that counsel's assessment of Chapman through two layers of deference, right? First, the Strickland deference to choices that counsel make, and we don't expect appellate counsel to raise every issue the record might present. And then we've got the second layer of deference to the state court's evaluation of that issue, right? Well, in this case, the final court on review to consider the ineffective assistance claims did not address defective performance, deficient performance. It only addressed prejudice. Yeah, but prejudice and performance are all mixed up together here, right? That may be so. I know you're in your rebuttal, but I need some help on something. Who is Brian Spodash, and why would his word about the other two men be so important? So because this case was a credibility case, the fact that he was going to testify directly to what their community of friends understood these men to be, which was liars, that is evidence that speaks directly to credibility. And this was a credibility case. Brian Spodash was someone who knew their friends and the community in which they lived and could speak to their reputation for honesty in that community. And accordingly, because this was a credibility case, that was particularly important probative evidence on the main issue before the jury, who to believe. And Spodash was allegedly this extraordinarily clean creature. There was no impeachment of Brian Spodash. Thank you, Your Honors. Thank you. Mr. Schneider. May it please the Court, Counsel, and Assistant Attorney General Josh Schneider on behalf of the Respondent Appellee. I bet you know what the first question is going to be. I don't want to guess. I'm sure I'll get it wrong. The State knew its witness, Martin, had given perjured testimony, it would seem, but opposed the defense's attempts to correct it by introducing the forgery charge. And that seems highly prejudicial because it seems to me that the State always has an obligation to not allow false testimony to go uncorrected. That is certainly true, Your Honor. NAPU makes it very clear that the State cannot suborn perjury. And for what it's worth, that was my first question, too. For what it's worth, I would have guessed wrong. And I bet you knew what it was. I bet you knew what it was. But there are two problems with a NAPU claim. One is that it's procedurally defaulted. The briefing before this Court is the first time that there's been any complaint about the prosecution not correcting the perjury. And the second problem is that it ultimately doesn't make any difference because the prejudice standards of Chapman, whether it's a NAPU claim or whether it's the improper limitation of impeachment for bias. But the State, I mean, sure Martin is impeached by other things, but a forgery impeachment is a whole different line of discrediting, shall we say, in front of the jury. And I think would have been extremely powerful to the extent, I think you almost have to say Martin was a useless witness, but I think that doesn't fly too well in light of how this trial was going on. I'm just concerned when something as core to one's honesty as forgery is the matter at issue in going down the road the State's suggesting. If it had been one more conviction for drugs or something, many things I can imagine wouldn't have made any difference. It just would have been cumulative. I don't see it here. Well, Your Honor, certainly it wasn't cumulative as counsel raised in the briefs. It was for bias rather than for the various other avenues of impeachment that had already been explored against Martin. This man's lying to you is what it was. That's certainly true. So it was not cumulative, but that doesn't mean that it wasn't harmless. Whether it was cumulative is an evidentiary determination of whether what it would tend to show has already been shown through sufficient evidence that additional evidence isn't really needed to make the impression on the finder of fact. But it can still be harmless. And the reason, as Judge Hamilton pointed out, there are two layers of deference here. It's whether appellate counsel on direct appeal could have reasonably determined that this claim, although it was definitely a clear error, was more likely to result in relief than the claims that counsel actually raised. And here it simply wasn't clearly stronger. Even though it was an obvious error, it was not a clearly stronger claim of error on appeal. And the reason it wasn't was, one, there was a decent chance that it would have been found harmless. But there's a decent chance that the law would be found against you too. I mean, throwing in a fourth point of error isn't that hard to do. We're not talking about the 25th point of error here. That's certainly true. And unless there's some rule that I'm not aware of that says appellate counsel is never required to raise a claim of clear error or abuse of discretion, then this looks like a good candidate for raising it. Well, counsel is always allowed to. No, but you're saying counsel is never ineffective for not doing it. No, Your Honor, that's not what we're saying. We're saying that in this case, counsel is not ineffective for not doing it because the claim was not clearly stronger than the three claims that were raised. We feel under any standard, but certainly when viewed through the highly deferential standard with which courts view counsel's decisions on which claims to make on direct appeal, here direct appellate counsel made three claims. First, they made a claim that. . . No, we know what they did. Yeah, no, we know what they did. I don't understand, I guess we should maybe move on, why Anderson's testimony would be irrelevant. I can't think of anything more relevant than an inculpatory witness who claims he saw someone else commit the crime. Don't the flaws in Anderson's testimony, I agree they were legion, okay, but they go to the weight a jury might give it rather than the relevance. That would be the case were Anderson's testimony that he drove with the other boys to the gas station and one of them went in and committed a murder. But that wasn't his testimony. As the trial court found on remand from MACL 3, it said that in its report to the reviewing court, the trial court on remand said that it had been tasked with determining the competence of Anderson at the time of trial and also with the relevance of what his testimony would have been and it found that his testimony would have been irrelevant because testimony would have been, the trial court found, as he had testified at the evidentiary hearing, which is why we have a chamber's question, which is we have this hearsay statement that would clearly, as Your Honor pointed out, have been favorable to the petitioner, but the only way to get it in would be through hearsay, as Anderson himself would not have said. Why is Anderson's statement a hearsay confession? Isn't it a confession about his own behavior, that he was a participant and heard the gunshot? I mean, even without any admission from that, I think it's Jay, he would have had value to MACL, wouldn't he have? Well, that's the facts that were in Chambers, where someone was called to the stand and they repudiated a confession they'd previously made to the crime that the defendant had been charged with, and the question was, were their previous statements confessing to the crime admissible? And the Chambers Court applied the four Chambers factors to determine whether that was the case. That's the case here. We have what is arguably an inculpatory statement by Anderson, that he then, were he called, he would have repudiated it. That's a factual finding from the state court. And the only time he's ever testified... Is that the finding, that he would have repudiated it if he had been called at the time of the original trial? Yes. The report of the trial court on remand from MACL 3. I apologize, I don't have a record site. I believe it's page 27 of the separate appendix, but I'm not sure. But the court says, what I've been tasked to do is determine the competence of Anderson and the relevance of what his testimony... the testimony he would have brought to trial. At the end, they say that his testimony would not have been relevant. When did he repudiate it? When did he repudiate it? The court found that he first repudiated it in 1995, but the first time he ever testified under oath was in the 1996 remand hearing. But the premise of the whole claim at trial was that if he had testified... The original trial was, what, in 1991? Was in 1991, yes. If he had testified when he was 11 years old in 1991, he would have testified consistently with the statement that tended to exculpate Maciel. Well, that was the premise of the claim as it was raised on direct appeal. The direct appellate counsel, based on the record on appeal, had this proffer that on its face appeared to be what we had in chambers, which was this is a material and favorable piece of testimony that the petitioner was barred from presenting. It went up on appeal, and the Maciel 1 court said, the trial court erred in not having explored this testimony to determine its relevance in his competence. So they sent it back to conduct that exploration, and after conducting the exploration, the court determined that his testimony, when explored under oath, was that he had once made up a story that he and three other boys had driven to a gas station one night and made up that story to get back at them for beating him up. Five years later. Right. But presumably the truth remains the truth, and the only time that Anderson testified under the oath, which we presume induces people to tell the truth where they might not otherwise. That's why we administer it. The only time he ever testified was at that hearing, and his testimony was that he had once made up the story. Now that doesn't mean that the prior story can't come in. Chamber shows that the story can come in. It also doesn't mean that the state court was correct to keep him out to begin with. I mean, the state is more than happy, I'm thinking of cases like Hardaway v. Young, to convict 11-year-olds. They're perfectly happy to have them interrogated without adults nearby, and yet here's a young person who's ready to testify, and they say, oh, well, he's got mental health problems, we're not going to let him in. So you're stuck with the second best of the proffer, and five years later, who knows what. But the case would look quite different if he had been able to testify when he should have been able to testify. It may have been that had he been called and put under oath, he would have given the story that was proffered. But the state court found that that story would have been perjury, and the petitioner was not entitled to the benefit of perjured testimony, and there's no reason to overcome the state court's factual determination that Anderson would have testified consistent with his subsequent testimony at the 96th hearing, that it was not true. But the question is not whether he might have or might not have. The question is whether the appellate court in MAC-EL-2 misapplied chambers, or applied chambers not only incorrectly, but in a way that is an unreasonable application by the light of any jurist. We submit that MAC-EL-2 did not unreasonably apply chambers. It cited chambers. It went through the four factors, and based on the four chambers factors, Anderson's proffered story was it lacked sufficient indicia of reliability to mandate its admission under chambers. It had not been made. But, you know, it's a funny process, because most witnesses don't have to go before the court and have a preliminary investigation by the judge to see whether the judge thinks their testimony is believable, and only then let the testimony in. That's the jury's job, you know, and it's the job of opposing counsel to impeach if you think the witness is not reliable. But we seem to have used kind of an inside-out procedure here. Well, the state appellate court was free to affirm on any basis in the record. Here it felt that it ended. It's not a totally crazy way to go about it, but rather than send it back for an entirely new trial based on whether this testimony would have been, one, offered by a competent witness and, two, relevant, where there was some question in the judge's mind that it may not have been relevant and he might not have been competent, it's not unreasonable to remand for that limited hearing rather than send it back for the entire new trial and find out at trial that, in fact, he wasn't competent or that he would not have testified consistent with his proffer as the court here discovered that the proffer was inaccurate. But even if he had gone back, even if he had testified consistently with his proffer at the hearing and they'd sent it back for a new trial and he had testified, it wouldn't have been... The exclusion was not prejudicial because his story was entirely incredible. He would have been obliterated on cross-examination. He had not met the boys, Brandon and O'Brien, until 1990. There was no indication that Jay existed. He said that, in his statement to the police, that the murder occurred in August, it occurred in October. He said that he snuck out of the house at midnight. The murder occurred an hour before he left the house. The boys were a couple... He said two or three years older than him. At the time, he was nine, so they were between 11 and 12 years old. They got into one of these 11- or 12-year-old boys' cars at midnight and drove to the gas station. One of the boys murdered someone. They got back in the car, drove back home, and that was their night. In addition, at the time, he was on psychiatric medications, which, as the trial court noted, he was not tolerating well. I believe it caused a certain amount of blacking out in the facility. And he had a predisposition at that age to dishonesty. That's a part that worries me more than anything, actually. Can I ask you about, I guess, in Machiael 4? Yes. I think I've got the Roman numerals correct at this point, since this has been going on so long. In paragraph 60 of the court's opinion, it's evaluating prejudice on the ineffective assistance of counsel claim. It ultimately says, defendant has not established that his conviction would have been reversed on appeal if counsel had raised that issue. That seems like a pretty clear misstatement of the Strickland prejudice standard, and we in the Supreme Court have repeatedly said that's an unreasonable application or a mistake. That is a misstatement. I believe my time is up. No. Thank you. Time's left. Your Honor, you're correct. But I'm going to insist you answer that question. You may always answer a judge's question. I am happy to answer that question. The answer to that question is that it's certainly a misstatement of the Strickland standard, but it is not a misstatement of the Strickland standard such as reveals a misunderstanding or misapplication of the Strickland standard. This court and the Supreme Court have repeatedly stated that where a state appellate court has properly enunciated the Strickland standard, the fact that they subsequently use inaccurate shorthand is not sufficient to establish an unreasonable application or contrary to standard being applied. Any further questions? All right. Thank you very much, Mr. Schneider. Anything further, Ms. Kapp? Two quick points, Your Honor, one with respect to Martin, one with respect to Anderson. With respect to Martin, first of all, at the ineffective assistance hearing, counsel testified she had no strategic reason for failing to raise these issues. In addition, the Martin forgery charges, there were eight of them. They were felony charges. They went not just to deception, though they were crimes of deception, they also went to why he was beholden to the state. And in fact, after he testified, the state dropped the eight charges against him and let him plead to one count of misdemeanor. That's in the record at DOC 24-33 ID 5019. So clearly he was beholden to the state. This was powerful impeachment evidence. Now with respect to Anderson, there are reasons why Anderson might have recanted even though he was telling the truth about his original statement. In between the time when he gave his original testimony and when the police approached him about recanting, he had been convicted of a home invasion robbery and car theft. And he was on probation at the time that they approached him. And therefore he had reasons to give an answer to the state that would be pleasing to them. That's in the record at DOC 24-25 ID 3811. And additionally, when he testified at the evidentiary hearing to his recantation, he was dating a relative of the victim. That is in the transcript or in the record at DOC 24-25 ID 3867-68. So there are many reasons other than the fact that he was lying about his original statement that he may have given a recantation. Finally, the state largely argues that the errors were harmless, but harmless error should not be misapplied in this case to excuse the cloaking of the truth. The truth that Anderson would have identified another person as the shooter in this case. The truth that the two key corroborating witnesses were unworthy of belief in a case that turned entirely on credibility determinations. These were important truths. Accordingly, the exercise of the writ is warranted. Thank you. Thank you very much. And we appreciate you and your firm accepting this appointment from the court. It's a great help to the court and of course to your client.